2026 IL App (1st) 242406

SECOND DIVISION
March 25, 2026

No. 1-24-2406

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* T.J., | ) | |
| | ) | Appeal from the |
| Minor-Respondent-Appellee | ) | Circuit Court of |
| | ) | Cook County |
| (The People of the State of Illinois, | ) | |
| | ) | 24 JA 243 |
| Petitioner-Appellee, | ) | |
| | ) | Honorable |
| v. | ) | Lisa M. Taylor, |
| | ) | Judge Presiding |
| L.M., | ) | |
| | ) | |
| Respondent-Appellant). | ) | |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justice D.B. Walker concurred in the judgment and opinion.
Presiding Justice Van Tine dissented, with opinion.

**OPINION**

¶ 1   A proceeding for an adjudication of wardship " 'represents a significant intrusion into the
sanctity of the family which should not be undertaken lightly.' " *In re Z.L.*, 2021 IL 126931, ¶ 58
(quoting *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004)). Parents have a constitutional right to make
medical decisions for their children that the State may not easily override. See *Troxel v.
Granville*, 530 U.S. 57, 65 (2000); *In re M.M.*, 2016 IL 119932, ¶¶ 27-28. But the State's *parens
patriae* duty to enforce a minor's medical care over parental objection is at its peak when a
minor's condition is life-threatening. *In re E.G.*, 133 Ill. 2d 98, 111 (1989).

¶ 2    This case invokes all these principles. The State here sought a finding of medical neglect after a mother refused to administer anti-seizure medication her epileptic child was prescribed, claiming the side effects were too severe and questioning the effectiveness of the medication itself. One would expect a nuanced, careful hearing at which expert testimony thoroughly discussed the pros and cons of the medication, the allegedly life-threatening need for such medication, and the availability of alternative courses of treatment.

¶ 3    Unfortunately, the adjudication hearing in this case, at which the trial court found the child neglected, fell far short of that standard, barely qualifying as an adversarial hearing at all. The State hardly put on any substantive evidence, choosing to dump thousands of medical records on the court as a substitute without specifically citing or discussing a single page; the defense put up almost no fight whatsoever; and the circuit court ruled in the State's favor only minutes after the admission of nearly 5,000 medical records into evidence. We agree with the mother that the hearing was "rushed, vague and incomplete."

¶ 4    What makes this case all the more disturbing is that the State has a colorable case for medical neglect. But it is clear to us from the medical records—about the only thing we have to go on besides the appellate arguments—that this matter is far more nuanced than one involving a mother who can't be bothered to medicate her child or who refuses to do so on principle. As best we can tell from the dump of medical records that comprise nearly all the evidence, this case involves a mother who has attempted medication after medication to address her son's serious illnesses but is concerned about both their efficacy and their significant, harmful side effects.

¶ 5    We cannot conduct a meaningful review of the evidence when it requires us, as judges, to wade through countless medical records that we cannot fully understand or appreciate without the assistance of expert testimony. More importantly, given the consequential stakes here, we

refuse to validate such a cavalier presentation of evidence and argument from both sides at trial. The child at the center of this dispute deserves so much more consideration.

¶ 6     We understand that judges, prosecutors, public guardians, and public defenders are overworked; that dockets are clogged with cases like this; and that the law imposes time deadlines on these proceedings. But these cases can result in the temporary and often permanent separation of parent and child. They must be taken more seriously than here. We cannot allow the adjudicatory hearing that took place below to stand as the final word on this matter.

¶ 7     We vacate the judgment at the adjudicatory hearing and all rulings that followed, including the dispositional judgment. We remand this cause for a new adjudicatory hearing.

¶ 8                                    BACKGROUND

¶ 9     The child here ("Minor"), age 13 at the time of the adjudicatory hearing, suffers from sickle-cell disease and epilepsy. In February 2024, he was hospitalized at Comer Hospital (Comer) for jaundice. Doctors discovered that his parents "had discontinued daily [anti-seizure] medication without discussion with our neurology team." Doctors wanted to restart the medication, but Minor's mother ("Mother") and putative father ("Father") "refused treatment."

¶ 10     The parents' refusal triggered a report to Comer's child abuse and protective services (CAPS) team. Dr. Veena Ramaiah, a "child abuse pediatrician" on the CAPS team, issued a report concluding that Minor was medically neglected. That conclusion mandated a report to the Department of Children and Family Services ("DCFS"). See 325 ILCS 5/4(a) (West 2022) (mandating reports of suspected child neglect).

¶ 11                    I. Petition for Adjudication of Wardship (March 2024)

¶ 12    On March 20, 2024, the State filed a petition for adjudication of wardship, alleging that Minor had been medically neglected and neglected by being subjected to an injurious environment. Each allegation was based on the same factual allegations:

"[Mother] ha[d] one prior indicated report for medical neglect. This minor ha[d] been diagnosed with epilepsy and prescribed medication. [Mother and Father] refuse[d] to administer this minor's epilepsy medication as prescribed. This minor ha[d] also been diagnosed with sickle cell disease. On or about March 1, 2024, this minor was hospitalized due to jaundice. Per medical personnel, jaundice is a complication from his sickle cell disease. This minor had a seizure while hospitalized. [Mother and Father] have missed multiple medical appointments for this minor to address his special needs. Medical personnel state that this minor ha[d] been medically neglected while in [Mother and Father]'s care. [Mother and Father] are resistant to participate in services. [Mother and Father] state that they are not willing to consent to this minor receiving his necessary medications. Paternity has not been established."

¶ 13    We note here that Father "didn't want anything to do with DCFS" and was uninterested in participating in Minor's life. Father never appeared, was defaulted after service by publication, and is not a party to this appeal.

¶ 14                    II. Motion for Temporary Custody

¶ 15    Along with the petition for wardship, the State sought immediate temporary custody of Minor. The supporting factual allegations in the motion were verbatim the allegations in the petition for wardship. Brittany Land Steele, a DCFS child protection specialist, swore in an affidavit attached to the motion that

"The doctor reported that she does not think the child needs to be removed from the home, however maybe someone on a higher level such as a judge can help intervene. She stated that this is the first time that all medication was fully discontinued by the parents. Prior to this they just had compliance issues from time to time. The parents have expressed that they feel as though their son is being treated like a guinea pig. The doctor[s] have changed the medications trying to accommodate the parents and the side effects they are reporting, however that does not appear to be the issue. The issue appears to be that they don't want the child to be on medication. Seizures cannot be predicted. There is a future risk of seizures and a subsequent life threatening event occurring as a result."

¶ 16    We lack a transcript of the hearing on the motion for temporary custody. The court (a different judge than the one presiding over the adjudicatory and dispositional hearings) denied the motion and allowed Minor to remain living with Mother. But the court entered an order of protection. The court's order included standard requirements, including, relevant here, that Mother "notify DCFS, or its assigns, within 24 hours, of any injury to the child (any bump, bruise, cut, scratch or fall), which would require professional medical treatment."

¶ 17    The court added conditions directed at Minor's medical care. Relevant here, the court required that Mother "administer all medically necessary medication to the minor & ensure that the minor adhere to dietary recommendations as recommended by medical professionals" and ensure "that the minor attend all necessary medical appointments."

¶ 18    As far as the record reveals, and as detailed below, from the date of the court's order of these supplemental conditions in March 2024 though and including the adjudicatory hearing in

December 2024, there is no evidence that Mother failed to administer the prescribed medication to Minor, though the testimony will show that she did miss two neurological appointments.

¶ 19                                III. April 2024 Status Hearing

¶ 20     In April 2024, Skylar Ward, the intact family case manager for Mother and Minor's family, provided an update on the well-being of Minor, who was living with Mother. Ms. Ward had made weekly visits to the home, including the previous Friday, April 19. Ms. Ward found the placement safe and appropriate and saw no signs of abuse or neglect of any kind.

¶ 21     Ms. Ward confirmed that "Mom has been giving [Minor] the medication," that she had a "release of records for La Rabida and a few other hospitals," and that "[Minor]'s been making his [medical] appointments."

¶ 22                                IV. June 2024 Hearing

¶ 23     In June 2024, Ms. Ward updated the court and again had no concerns for Minor's safety or well-being at the time. She had received all pertinent hospital records from "Comer and La Rabida." She explained that recent tests showed that Minor maintained "therapeutic" levels of his seizure medication, Fycompa. She also reported that she did not think a "special diet" was the current recommendation from Minor's providers or, in any event, was "not aware" of his diet.

¶ 24                                V. August 2024 Hearing

¶ 25     The adjudication hearing was scheduled for August 21, 2024. The guardian ad litem, or "GAL," requested a continuance due to an "emergent" situation discussed off the record. The court granted that request. The adjudication hearing was continued to December 2024.

¶ 26                                VI. October 2024 Incident

¶ 27     In October, Minor fell and broke his arm. At the hospital, Mother reported that he fell while sleepwalking (which she said was one of the side effects of his epilepsy medication). The

emergency room notes indicate that the doctors were skeptical and feared that a seizure led to the injury. Mother did not report the injury to DCFS, in violation of the protective order.

¶ 28                                    VII. Adjudicatory Hearing

¶ 29    On December 2, the court held the adjudicatory hearing. Notably, Mother was absent. (The DCFS social worker, Ms. Ward, would later testify that that Minor was home sick or at least not in school that day.) At the hearing, three witnesses testified: Chyna Roundtree and Brittany Land Steele, both DCFS "child protection specialists," and Dr. Ramaiah from the Comer CAPS team.

¶ 30                                        A. Chyna Roundtree

¶ 31    Ms. Roundtree was assigned to Minor's case and met with Mother in early March 2024, when the case was first opened. During that meeting, Mother told Ms. Roundtree

> "that the medications that [Minor] had been taking had been causing adverse reactions. I want to say she even mentioned that he had gotten hurt after taking the medications, so she had expressed concerns about them, and she reported that he was not taking medications at the time due to concerns with the medications that were prescribed."

¶ 32    To address Minor's medical needs, Mother "spoke about some dietary changes and research, holistic research and reaching out to holistic professionals in regards to trying to find alternative ways to address his issues." When asked whether Mother would consider putting Minor back on medication, Ms. Roundtree reported that she "said she would not put him back on the medication." According to Ms. Roundtree, Mother became emotional and said something to the effect of "the President of the United States couldn't make her put the baby on the medication again."

¶ 33    The defense had no questions of this witness.

¶ 34                              B. Brittany Land Steele

¶ 35    Ms. Land Steele's testimony was consistent with that of Ms. Roundtree. In March 2024, Mother reported that she "was giving him fruits and vegetables" (which, as best we can tell from the medical records, was part of the modified Atkins diet he was prescribed), but she was "not giving him the medication, that he had been fine." Mother explained that "she didn't feel comfortable giving him the medication and she wanted to try the fruits and vegetables." Ms. Land Steele did not recall if Mother had previously been indicated for medical neglect.

¶ 36    The defense had no questions of this witness.

¶ 37                      C. Admission of CAPS Report and Medical Records

¶ 38    The State admitted the Comer CAPS report prepared by Dr. Ramaiah and over 4,600 pages of certified medical records. The defense did not object. The State then rested.

¶ 39                                  D. Dr. Ramaiah

¶ 40    Without a break in the proceedings, the GAL then called Dr. Ramaiah. Dr. Ramaiah first established that she was an expert "in the field of child abuse pediatrics." She then explained that the case was referred to her CAPS team after it was discovered that Minor's parents "had discontinued the medications without speaking to a medical provider." (She did not specify what medication she was referring or provide any other detail.)

¶ 41    Dr. Ramaiah and her team never met or spoke with Minor or Mother; this was what she called a "remote" or "chart" review only. As she put it, "this particular case involved an extensive chart review and discussing with all the treating team members what their concerns were and why they had those concerns and what were the actual statements or events that led to those concerns." Using EPIC—"a medical documentation system"—she was able to review all of Minor's medical records, including those from other hospitals.

¶ 42　The CAPS team diagnosed Minor with "medical neglect." The CAPS report indicates that the "[t]otal time spent" by the CAPS team "was 120 minutes."

¶ 43　Dr. Ramaiah claimed that medical neglect is both a medical diagnosis and child-welfare diagnosis. She reached this diagnosis "to a reasonable degree of medical certainty using accepted and reviewed peer methods within the field of child abuse and neglect pediatrics." This finding of medical neglect prompted a mandatory report to DCFS. As the doctor testified, "once there's a concern of medical neglect or, in our case, a final diagnosis of medical neglect, then we advise to report to DCFS. You know, as mandated reporters, we're required to report."

¶ 44　That is the extent of Dr. Ramaiah's testimony; it spans just under ten pages in the transcript, at least half of which was taken up detailing her qualifications as an expert. She did, as noted, state her opinion of "medical neglect," but that, literally, was the extent of her substantive testimony. She did not testify to the details of Minor's epilepsy, the various medications he had taken over the years, the current medication doctors prescribed, the benefits and side effects of that currently prescribed medication, or the short- and long-term ramifications of Minor *not* taking an anti-seizure medication. Indeed, the doctor did not even testify that the medication over which Mother and the doctors were arguing was, in fact, an anti-seizure medication, or that the relevant problem the doctors were trying to treat was epilepsy, as opposed to sickle cell disease.

¶ 45　The defense had no questions of Dr. Ramaiah.

¶ 46　The GAL rested. The defense then rested without calling any witnesses. Without a break in the proceedings, the matter moved to closing arguments.

¶ 47　　　　　　　　　　　E. Closing Arguments

¶ 48　The State's argument was brief. We quote from it liberally here. We highlight the portions of the closing argument reciting facts that were *not* based on sworn hearing testimony:

"[Minor] was diagnosed with sickle cell. He also had a seizure disorder. The mother refused to give him the medication as needed. *When he was hospitalized for jaundice in late February, the minor had a seizure the next morning. When they spoke to the mother at that time on page 2 of the extract—and I'll quote it into the record—'mom repeatedly stated that she does not want [Minor] on these medications as she feels that they make him sleepy, sleepwalk, change him mentally, and damage his liver.'*

*Throughout their conversations with the mother, she reiterated that she does not like what these medications do to him and she feels that he will have seizures regardless. That was the reason why she refused the medication. Your Honor, in addition to the medication, the doctors explained to the parents that they needed to put the minor on a keto diet. The mother also refused the keto diet. She was giving him, according to her—in the medical records, a low-carb diet. However, later in the medical records, it is found that it did not seem he was on any type of a high-protein diet, as the minor's urine did not show any signs of ketosis, which is essentially what happens when you put him on a keto diet.*

As a matter of fact, your Honor, even when DCFS stepped into the situation, you heard Ms. Chyna Roundtree's testimony that the mother told her that not even the President of the United States would make her give this child the medication that the doctors were prescribing.

In addition to that, your Honor, [Father] refused to participate with DCFS or any services, refused any conversations. *Your Honor, it appears from the records and the consultation records this mother was spoken to several times, and as per Dr. Ramaiah's*

*review of the records and DCP's testimony, this was not the first time that this minor had been deemed to be medically neglected.*" (Emphasis added.)

¶ 49    The GAL adopted the State's argument and added some observations. Again, we highlight the portions of the GAL's discussion of facts that did *not* come from live testimony:

"Dr. Ramaiah, she was certified as an expert. Her evidence was uncontroverted and unrebutted *and is corroborated by the medical records that the Court has before it*. I can't understand what happened in this case in terms of the parents' refusal to provide the medication.

I am sympathetic to concerns of side effects, *but the medical records show that the medical professionals have done everything they can to work around those concerns. They've tried additional medication and even provided dietary alternatives that would help minimize the need for the medication, and the family would not comply with that. So the only conclusion I'm left to draw at this time is that the family was not concerned with [Minor]'s well-being and safety and was not complying with his treatment for just their own lack of follow-through and their own negligence ***.*" (Emphasis added.)

¶ 50    Then it was time for Mother's attorney's closing argument. In its entirety: "I would ask the Court to hold the People to their burden of proof and respectfully deny their request."

¶ 51                                F. Court Ruling

¶ 52    The Court concluded "unequivocally that the State has met its burden of proof as it relates to the allegations of the petition and the unrefuted testimony of credible witnesses that I've heard." The court elaborated:

"I guess my concern is *** the jaundice is a side effect of the medication for the seizures, but if he has a seizure and loses, you know, brain activity, then he's essentially

deceased, and so I think to stop that medicine without some further intervention or trying

to dose it down or do something to try to reach, for lack of a better way to phrase it, a

happy medium to make sure that this young person is getting the care he needs because,

in addition to the seizure disorder, he's got sickle cell. So that just raises all kinds of

concerns.

So the factual basis by which I am finding this young man neglect, lack of care

and neglect, injurious environment, number one, the medical records, number two, the

unrefuted testimony of the physician, but also the very credible testimony of Ms.

Roundtree and Ms. Land Steele, especially as it relates to [Father] because I'm finding as

to both parents, and his unwillingness to even participate in the process. And I will state

for the record that duty judge documented [Father]'s got a new paramour and a new

child, and that's where his focus is, and so that is quite egregious, but I do just want to

note that for the record."

¶ 53        VII. Dispositional Hearing and Motion to Violate Order of Protection

¶ 54    What followed after the adjudicatory hearing was an oral motion by the State to vacate

the protective order under which Mother was allowed to retain custody of Minor pending the

adjudicatory hearing, plus the dispositional hearing itself. Because, as we previewed, we are

vacating the adjudicatory hearing, we necessarily vacate the dispositional hearing, too, and need

not recount it in detail. We will discuss the State's oral motion to vacate the protective order, and

the hearing on that motion, later in this opinion.

¶ 55    This appeal followed. Initial appellate briefing concluded on October 17, 2025. We

ordered supplemental briefing on the constitutional question of a parent's right to refuse medical

treatment for his or her child and the circumstances in which the State may override parental objections. That briefing concluded in December 2025.

¶ 56                                    ANALYSIS

¶ 57    Mother makes several arguments on appeal. First, she raises an evidentiary objection, that the court improperly admitted the CAPS report, claiming it was not a business record and was thus inadmissible hearsay. Second, she argues that the finding of neglect at the adjudicatory hearing was against the manifest weight of the evidence. And third, she argues that the court erred in finding that Mother violated the order of protection.

¶ 58                              I. Adjudicatory Hearing

¶ 59    The Juvenile Court Act (the "JCA") lays out a framework to determine if children should be removed from their parental home and made wards of the State. After the State files a petition for adjudication of wardship, the court may, on motion of the State and under certain circumstances, temporarily remove the minor from parental custody pending the adjudicatory hearing. 705 ILCS 405/2-10 (West 2022). The court then holds an adjudicatory hearing to consider the State's allegations of abuse, neglect, or dependency. *Id.* § 2-21. If the child is found neglected, the court holds a dispositional hearing to determine the disposition that best serves the child's health, safety, and welfare. *Id.* §§ 2-21(2), 2-22(1), 2-24.

¶ 60    A minor is "neglected," among other ways, if he or she "is not receiving the proper or necessary *** medical *** care recognized under the State law as necessary for a minor's well-being." *Id.* § 2-3(1)(a). A "neglected minor" is also one "whose environment is injurious to his or her welfare." *Id.* § 2-3(1)(b). These definitions include both an intentional and unintentional disregard of duty. *Arthur H.*, 212 Ill. 2d at 463. The definitions are fluid; what constitutes "neglect" or an "injurious environment" is intensely fact-specific. *Id.*

¶ 61    The State must prove the allegations of abuse or neglect by a preponderance of the evidence—that the allegations are more probably true than not. *Z.L.*, 2021 IL 126931, ¶ 61. We will not disturb the trial court's findings of abuse or neglect unless they are against the manifest weight of the evidence, meaning the opposite conclusion is clearly evident. *Id.*

¶ 62    The stakes are high in adjudicatory hearings. As noted, parents have a constitutional right to the care and custody of their children, including the right to make medical decisions for them. See *Troxel*, 530 U.S. at 65; *M.M.*, 2016 IL 119932, ¶¶ 27-28. Findings of neglect can lead to the temporary separation of parent and child, as here.

¶ 63    But that temporary separation can easily turn into a permanent one. The termination of parental rights, the ultimate flex of state authority, requires proof by clear and convincing evidence as a matter of due process. 705 ILCS 405/2-29(2) (West 2022); see *Santosky v. Kramer*, 455 U.S. 745, 766-67 (1982) (permanent separation of parent and child requires proof by clear and convincing evidence to protect parental liberty interests in care and custody of children). But a finding of neglect, under the more lenient preponderance standard at an adjudicatory hearing, can be used against the parent in a proceeding to terminate parental rights. See *In re H.C.*, 2023 IL App (1st) 220881, ¶ 123. So the adjudicatory hearing is consequential, indeed.

¶ 64    We agree with Mother that the adjudicatory hearing that took place here did not live up to its mission. As we explain below, the evidence consisted of little more than a dump of thousands of medical records that the circuit court could not possibly have reviewed before issuing its findings of neglect, and which we cannot meaningfully review, either, absent expert testimony.

¶ 65    As detailed above, in sum and substance, the live testimony at trial consisted of only this: (1) two DCFS case workers testified that Mother was refusing to give some prescribed medication (what medication, they did not say; for what illness, they did not mention), that

Mother expressed concern about the medication's side effects on Minor, and that Mother preferred to work with a diet-based treatment; and (2) a child-abuse pediatrician testified that she assembled Minor's medical records, reviewed them, and diagnosed Minor with "medical neglect." The remainder of the State's case was a flood of medical records, never discussed at trial by any witness, referenced in closing argument only briefly a single time.

¶ 66    For many independent reasons, we find this evidence entirely unsatisfactory.

¶ 67                              A. "Medical Neglect" as Diagnosis

¶ 68    To begin, we are not the first court to question whether the diagnosis of "medical neglect" is truly an expert medical diagnosis. As it simply tracks the law's definition of "neglect," it is more aptly deemed a "legal opinion *** rather than a medical diagnosis." *H.C.,* 2023 IL App (1st) 220881, ¶ 116. As Dr. Ramaiah explained, the point of the CAPS team investigation and report was to determine whether Minor was "neglected" as defined under the state law that triggers a physician's mandatory duty to report "neglected minors" to DCFS. See 325 ILCS 5/4(a)(1) (West 2022) (physicians must report abused or neglected children). Relevant here, that duty is triggered when a child "is not receiving the proper or necessary *** medical *** care recognized under State law as necessary for a child's well-being." *Id.* § 3 (definition of "Neglected child"). That definition, as it should, tracks verbatim the definition of "neglect" under the JCA. See 705 ILCS 405/2-3(1)(a) (West 2022) ("neglected" minor is one who "is not receiving the proper or necessary *** medical *** care recognized under State law as necessary for a minor's well-being").

¶ 69    As we alluded to in *H.C.*, we do not see how we can view Dr. Ramaiah's opinion as anything other than a legal conclusion—testimony that the Minor's condition met the legal definition of a "neglected child" under state law. That is to say, in the opinion of the CAPS team,

based on conversations with Minor's treating physicians and a review of his labs and other medical records, Minor here was "not receiving the proper or necessary *** medical *** care" that was "necessary for [Minor's] well-being." 325 ILCS 5/3 (West 2022).

¶ 70    We are not critical of that conclusion; that is not our point. The doctor and her CAPS team were doing their job under the mandatory-reporting statute. But that doesn't make their conclusion a medical diagnosis, like one would diagnose autism or cancer or schizophrenia.

¶ 71    And to the extent that Dr. Ramaiah would insist that her opinion was a medical diagnosis of Minor's condition, we fail to see how she, in particular, would be qualified to render it. By her own account of her qualifications, she is a child-abuse pediatrician who works in "child advocacy and protective services," not a neurologist or someone trained in the treatment of epilepsy. See *H.C.*, 2023 IL App (1st) 220881, ¶ 113 ("[W]e cannot help but notice that Dr. Jones does not appear to be a neurosurgeon, neurologist, endocrinologist, or any other specialist that might have had particular insight into [minor]'s conditions," as Dr. Jones specialized in " '[c]hild [a]dvocacy and [p]rotection' ").

¶ 72    Dr. Ramiah is surely trained in child abuse. She noted, for example, that when dealing with allegations of physical abuse, "we have to see the child and document the injuries" to determine whether they are consistent with abuse. She would perform much the same function, presumably, in the area of child sexual abuse. We have no reason to doubt that Dr. Ramaiah is a capable doctor competent to render any number of opinions in the area of child abuse.

¶ 73    But the treatment of epilepsy? The medications necessary to treat that illness? The consequences of *not* treating epilepsy with anti-seizure medication? Dr. Ramaiah did not lay any foundation to demonstrate that she had expertise in the specific disciplines of neurology or the treatment of epilepsy. Obviously, as she herself testified, the team got its information from

neurologists and like medical professionals who actually treated Minor. Again, there is nothing wrong with obtaining the information from those qualified to speak in those disciplines, summarizing the conclusions, and passing that information along to DCFS in a mandatory report.

¶ 74     But reporting to DCFS is one thing; testifying in court is another thing altogether. Illinois Rule of Evidence 702 (eff. Jan. 1, 2011) permits a witness "qualified as an expert by knowledge, skill, experience, training, or education" to testify about "scientific, technical, or other specialized knowledge" that assists the trier of fact. It does not permit a witness to pass along an opinion from *someone else* who has such specialized knowledge.

¶ 75     The State did not call even one of Minor's treating physicians or any other medical professional trained in neurology, the treatment of epilepsy, or the like, to testify that a particular anti-epilepsy medication was necessary for this particular child's well-being, if not survival. We are thus not convinced that this case was the subject of any meaningful expert testimony at all.

¶ 76                    B. Competence of Medical Records Alone

¶ 77     But second and more saliently: even if the conclusion of "medical neglect" *was* a medical diagnosis, not a legal conclusion, and even if Dr. Ramaiah *was* qualified to give that diagnosis, the fact would remain that Dr. Ramaiah gave only that ultimate conclusion and nothing more.

¶ 78     Whether it was because she was unqualified to so testify or because the GAL simply did not ask her these questions, Dr. Ramaiah did not testify to (1) the details of Minor's epilepsy or an explanation of epilepsy in general; (2) the fact that Minor had been on numerous previous medications—as best we can tell from the medical records, "VPA," "LEV," "PER," and "ZNS"—much less the results, positive and negative, of those different medical treatments; (3) the medication Mother was currently refusing to administer, which medical records indicate was a drug called "Fycompa;" (4) the pros and cons, including side effects, of Fycompa;

- 17 -

(5) whether the benefits of Fycompa outweighed the risks in her medical opinion; and (6) the *ramifications* of Minor not taking a seizure medication—for example, whether it would lead to life-threatening or irreparably harmful health results.

¶ 79    Instead, the State and GAL simply elicited the legal conclusion of "medical neglect" and nothing more, after admitting over 4,600 medical records into evidence without Dr. Ramaiah (or any other witness) specifically citing a single page. Then, as we chronicled in more detail above, in closing arguments, the State and GAL told a story of Mother's neglect that came almost entirely from those medical records, as if it were the circuit court's (and now our) job to hunt and peck for the relevant pages and fully understand them once we did.

¶ 80    For example, the State told the court in closing argument that Mother had repeatedly resisted anti-seizure medication over the years due to the side effects on Minor:

> "Throughout [the treating physicians'] conversations with the mother, she reiterated that she does not like what these medications do to him and she feels that he will have seizures regardless. That was the reason why she refused the medication. Your Honor, in addition to the medication, the doctors explained to the parents that they needed to put the minor on a keto diet. The mother also refused the keto diet. She was giving him, according to her—in the medical records, a low-carb diet. However, later in the medical records, it is found that it did not seem he was on any type of a high-protein diet, as the minor's urine did not show any signs of ketosis, which is essentially what happens when you put him on a keto diet.
>
> ***
>
> Your Honor, it appears from the records and the consultation records this mother was spoken to several times, and as per Dr. Ramaiah's review of the records and DCP's

testimony, this was not the first time that this minor had been deemed to be medically neglected."

¶ 81    The GAL, in closing argument, added that "the medical records show that the medical professionals have done everything they can to work around [Mother's] concerns. They've tried additional medication and even provided dietary alternatives that would help minimize the need for the medication, and the family would not comply with that."

¶ 82    A compelling story, to be sure, but one for which absolutely no live testimony was presented. And the appellate briefs are no different. Virtually all the substantive evidence cited by the State and GAL comes from medical records that were never once discussed at the adjudicatory hearing.

¶ 83    We understand the time demands and the clogged dockets of these courts, but the medical records alone show that the State had its choice of numerous neurologists and others who treated Minor over the years, any one of whom would appear to be fully competent to testify on the particulars of Minor's treatment, the pros and cons of their prescribed medications and diet-based treatments, the pros and cons of Mother's requested alternative treatments, and the consequences of failing to treat Minor with anti-epilepsy medications. Even an expert in the discipline who had *not* treated Minor could have covered most of, if not all that ground. This is not how a case of this magnitude, impacting fundamental constitutional rights, should be tried.

¶ 84    Nor is it how such cases are *typically* tried. In the small sampling of medical-neglect cases in Illinois, we have affirmed based on expert testimony detailing the specifics of the minor's medical problems, the necessity of treatment, and the consequences of non-treatment.

¶ 85    For example, in *In re N*., 309 Ill. App. 3d 996, 998 (1999), the State alleged that the minor's parents refused follow-up treatment for a child who " 'was born premature, after

suffering inter cranial [*sic*] bleeding and also [has] an inguinal hernia.' " At the adjudication hearing, the State's expert fully and completely explained the minor's condition, the problems he faced, the recommended treatment, and the consequences for failing to get that treatment. *Id.* at 999-1000.

¶ 86    *In re Stephen K.*, 373 Ill. App. 3d 7, 10 (2007), involved allegations that a minor with cystic fibrosis was neglected due to the parents' " 'extensive history of marginal medical compliance on behalf of this minor.' " The State's expert gave detailed testimony explaining cystic fibrosis, its health effects, the minor's prognosis, and the severe consequences of failing to treat. *Id.* at 10-11.

¶ 87    In *In re Erin A.*, 2012 IL App (1st) 120050, ¶ 2, the trial court found the minor neglected for failure to "undergo recommended follow-up blood screening to determine if she had sickle cell disease or merely the trait." The State's expert testified about the concern over sickle cell disease (*id.* ¶ 12), the process for testing (*id.*), and the "possible health risks to [minor] associated with failing to have her undergo the rescreening" (*id.* ¶ 16).

¶ 88    Closer to home in one sense, different in another, *Tyagi v. Sheldon*, No. 16 C 11236, 2017 WL 4130532, at *11 (N.D. Ill. Sept. 18, 2017), started as an administrative challenge by parents to the State's demand that their child's epilepsy be treated with anti-seizure medication over their religious objection. It turned into a civil-rights lawsuit brought in federal court by the parents. The administrative law judge initially hearing the dispute "found, after reviewing hundreds of pages of exhibits and *hearing sworn testimony from three physicians*, that treating [the minor] with the ketogenic diet alone exposed him to risk of status epilepticus, brain damage, and possibly death" and that "the ketogenic diet, while efficacious in certain cases of epilepsy, was inadequate to control [the minor]'s seizures." *Id.* at *12 (emphasis added).

¶ 89    This is nothing new. Over 70 years ago, in *People ex rel. Wallace v. Labrenz*, 411 Ill. 618, 620 (1952), our supreme court upheld a finding of neglect based on the parents' religious objection to a blood transfusion. The supreme court heavily relied on the testimony of three doctors. Two of them "were certain that the child would die unless a transfusion was administered"; the third believed the child had a "slim chance" at survival but would suffer irreparable brain damage if she lived. The doctors testified to the risks of the transfusion, as well, each opining that the benefits far outweighed any risk. *Id.* at 621. This expert medical testimony left "no doubt that this child, whose parents were deliberately depriving it of life or subjecting it to permanent mental impairment, was a neglected child." *Id.* at 624.

¶ 90    Though in a different procedural posture, *Tyagi* strikes closest to the facts of our case. Yet we can say none of the things about the evidence in the hearing before us that the federal judge wrote about the administrative hearing there. Here, we had no expert testimony to speak of, other than a bare conclusion of medical neglect—nothing that discussed the particulars of Minor's epilepsy, nothing of the risks or rewards of various medications, nothing of the potential lethal or irreparable health consequences of not taking the medication.

¶ 91    This case is reminiscent of *H.C.*, 2023 IL App (1st) 220881, ¶¶ 5, 37-40, another medical-neglect case where the State, for whatever reason, opted to put on no expert testimony and simply dumped a slew of medical records into the record as a substitute. The State sought wardship of the mother's three remaining children after the fourth child, Nol. B., had died from numerous, severe medical problems. The State alleged that the mother's psychiatric issues caused her to "decline[ ] to follow recommended medical interventions for Nol. B.'s significant medical issues." *Id.* ¶ 6. At the hearing, in lieu of live medical testimony, the State introduced

some 20,000 pages of medical records. *Id.* ¶ 37. When the State, on appeal, "insist[ed] that these records themselves [were] incontrovertible proof of appellant-mother's neglect," this court

"[saw] no way to conclude that[,] when there was no testimony from an expert witness to help us make sense of them. This is not a case, for example, where Nol. B. had suffered injuries that were obviously intentionally inflicted by a parent. Nor is it a case where Nol. B. was simply not getting medical attention that he needed. To the contrary, the records entered into evidence indicate appellant-mother was constantly and routinely seeking out medical care for Nol. B." *Id.* ¶ 141.

¶ 92   The court expressed its "bewilderment at the way the evidence in this case was presented" (*id.* ¶ 148), most notably "that the State intended to prove its case almost entirely through cold medical records" (*id.* ¶ *Id.* 149). The court added:

"[W]hile we recognize that [the JCA] permits the admission of business records and that it places no explicit limits on how much evidence can be admitted this way, we are forced to ask: should there be limits?

Hearsay exceptions are meant to be just that—exceptions—and not the rule. Part of the rationale for business records exceptions is that businesses will flounder if they cannot keep accurate records, and therefore there is little reason to doubt the veracity of the information contained in them. [Citation.] But the records admitted in this case were not admitted only for simple reasons such as proving whether a diagnosis was made, or whether medical care took place on a certain day, or even if a particular recommendation was made as to treatment. They were also admitted to prove a legal conclusion, which is that Nol. B. was neglected or abused. But how can we be expected to evaluate records like this and draw factual and legal conclusions from them when we are not doctors and

have no medical testimony to help us understand them?" *Id.* ¶¶ 151-52.

¶ 93     We wholeheartedly agree. The fact that they are admissible as business records " ' "does not give parties free rein to introduce medical records as a substitute for expert medical testimony." ' " *People v. Siddiqui*, 2023 IL App (3d) 220489-U, ¶ 22 (quoting *People v. Arze*, 2016 IL App (1st) 131959, ¶ 110, quoting *Troyan v. Reyes*, 367 Ill. App. 3d 729, 736 (2006)).

¶ 94     Indeed, the JCA's provision governing the admissibility of medical records in neglect proceedings does not allow those records to serve as a substitute for expert testimony. Section 2-18(4)(a) governs the admission of hospital records created in the ordinary course of business and provides in relevant part that

> "[a]ny writing, record, photograph or x-ray of any hospital ***, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a minor in an abuse, neglect or dependency proceeding, shall be admissible in evidence *as proof of that condition, act, transaction, occurrence or event*." (Emphasis added.) 705 ILCS 405/2-18(4)(a) (West 2022).

¶ 95     Medical records may be admissible under section 2-18(4)(a), but their admissibility is limited to proving the condition, act, or event memorialized. For example, a medical record may be used to prove "whether a diagnosis was made, or whether medical care took place on a certain day, or even if a particular recommendation was made as to treatment." *H.C.*, 2023 IL App (1st) 220881, ¶ 152. Here, then, the medical records could be used to establish such things as Minor presenting at the emergency department with jaundice, or Minor missing an appointment, or Minor's bloodwork testing low or high for a particular substance or medication.

¶ 96     But medical records cannot substitute for expert opinion. Expert testimony requires, first, the laying of a foundation that a witness is qualified by specialized knowledge in a particular

field to provide that opinion. See Ill. R. Evid. 702 (eff. Jan. 1, 2011). And experts must testify to their opinions within a reasonable degree of certainty based on that specialized knowledge. *Torres v. Midwest Development Co.*, 383 Ill. App. 3d 20, 27 (2008) ("An expert's testimony must be to a reasonable degree of certainty within the field of his expertise to be admissible."); *Lange v. Freund*, 367 Ill. App. 3d 641, 650 (2006) (same); *Matuszak v. Cerniak*, 346 Ill. App. 3d 766, 772 (2004) (same); see *In re M.T.*, 2025 IL App (1st) 232134, ¶ 35. The medical records are not a substitute for that testimony.

¶ 97     For example, the State here was required to prove that a particular medication prescribed for Minor was necessary to his well-being—according to the State, that Minor could suffer brain damage or death if he did not consistently take a certain anti-seizure medication. No medical record could substitute for that expert opinion. Even if we could pull such a passage from some doctor's note in the medical records, we would need to know the qualifications of that doctor to lay the appropriate foundation, and we would require testimony under oath that the doctor is rendering that opinion to a reasonable degree of medical certainty.

¶ 98     The GAL tries to downplay the importance of expert testimony generally, claiming that "in order to prove an allegation of medical neglect, it is not necessary for a doctor to testify." For that frightening proposition, the GAL cites *Erin A.*, 2012 IL App (1st) 120050, ¶ 7, where this court wrote that "there is no statutory requirement or Illinois case law ruling that requires a finding of medical neglect to be supported by expert medical testimony."

¶ 99     We are unsure why the court in *Erin A.* went to the trouble of making that statement in *dicta*, given that a medical expert indeed testified in that case to explain sickle cell disease, why re-screening for the disease is necessary for an infant after six months, the process for testing, and the health risks associated with failing to get follow-up care. *Id.* ¶¶ 12-16.

¶ 100   But to the extent this statement in *Erin A.* can be taken as some general rule that expert testimony is *never* required in a medical-neglect case, we firmly disavow it. And at least two decisions from this court have, indeed, relied on this *dicta* from *Erin A.* to suggest as a bright-line rule that expert testimony is not required in medical-neglect proceedings. See *In re H.B.-H.*, 2025 IL App (1st) 242275, ¶ 74 ("[W]e observe that this court has held that 'there is no statutory requirement or Illinois case law ruling that requires a finding of medical neglect to be supported by expert medical testimony.' " (quoting *Erin A.*, 2012 IL App (1st) 120050, ¶ 7)); *In re R.R.*, 2021 IL App (4th) 200563-U, ¶ 17 ("Illinois law does not require a finding of medical neglect to be supported by expert medical testimony." (citing *Erin A.*, 2012 IL App (1st) 120050, ¶ 7)).

¶ 101   We emphatically disagree with these sentiments expressed in *Erin A.*, *H.B.-H.*, and *R.R.* Just as it is incorrect to say that expert testimony is *always* required in certain cases, see *Thompson v. LaSpisa*, 2023 IL App (1st) 211448, ¶ 32, it is likewise wrong—dangerously wrong—to suggest that expert testimony is *never* required in a medical-neglect case.

¶ 102   And it is wrong, as well, for those cases to suggest that no controlling authority governs this issue. What about the rules of evidence? As we explained in *Thompson* (*id.* ¶ 34), in any case governed by the rules of evidence, as here, if an opinion is based on "scientific, technical, or other specialized knowledge," a lay witness may not testify to that opinion. Ill. R. Evid. 701 (eff. Jan. 1, 2011). Only "a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto." Ill. R. Evid. 702 (eff. Jan. 1, 2011).

¶ 103   We should not be advocating a *per se* rule in either direction—that expert testimony is *always* required in medical-neglect cases or that expert testimony is *never* required in those cases. Such blanket proclamations lead to misinterpretation and sloppy application, lulling the State into believing it has a free pass to dump medical records into the record as a substitute for

expert testimony and leading courts, like the trial court here and the courts in *H.B.-H.* and *R.R.*, to countenance it. The better rule, as always, is to consider the facts of each case and simply determine whether specialized knowledge is required to prove a certain proposition. If it is, as it usually will be in medical-neglect cases, then expert testimony is required. If not, no expert testimony is needed.

¶ 104    Here, we do not hesitate in finding that expert testimony was required. At a minimum, the State was required to prove (1) that a particular medication was necessary to effectively treat Minor's epilepsy and (2) that Minor would suffer adverse health consequences, such as brain damage or death, if he did not receive the medication. And that is only the bare minimum. Given that Mother was clearly trying medication after medication over the years to treat her son but continually grappled with the harmful side effects on her child, and the record appears to support Mother's claim on appeal that she was trying alternative treatments, one would hope that expert testimony could dive more fully into those areas, as well—an assessment of the pros and cons of the medication and Mother's preferred alternative treatments.

¶ 105    Instead, all we heard at this adjudicatory hearing was that an expert in child-abuse pediatrics reviewed the medical records and found "medical neglect." From the adjudicatory hearing testimony alone, you would not even know the medication the doctors prescribed for Minor. Indeed, you would not even know that this medication was treating his epilepsy, as opposed to his sickle cell disease. And you would not hear one whiff of opinion or even lay testimony about the potential adverse consequences to Minor of *not* taking the drug.

¶ 106    On a practical level, as well, there are many problems with trying a case like this solely on medical records without the assistance of an expert, much less any indication of which pages are relevant. For one, the sheer volume. Surely not every one of the 4,600 pages of medical

records is relevant here. And nearly every single page of these medical records is filled with information, much of it written in shorthand medicalese incomprehensible to the layperson.

¶ 107 Indeed, even when the State's and GAL's appellate briefs cite various pages of the medical records, we often had to scan the page more than once just to find the passage to which they were referring. As in *H.C.*, 2023 IL App (1st) 220881, ¶ 154, "[t]he result here is that the State entered [4,600] pages of medical records into evidence *en masse* and effectively said to the trier of fact, 'you figure it out.' "

¶ 108 And there is simply no possibility the trial court was able to do so. There is no chance, from the time these 4,600 records were admitted, followed without a recess by Dr. Ramaiah's testimony and closing arguments before immediately proceeding to the adjudicatory ruling, that the circuit court could have even glanced at these medical records, much less known which ones deserved primary focus, and much less fully digested them.

¶ 109 As a result, on appeal, without any assistance from trial testimony, lawyers for the State and the GAL were left to rifle through the medical records in search of evidence, after the fact, to justify the trial court's neglect findings. With the record in this condition, both Mother and this Court were left to wait until the State's and GAL's *response briefs on appeal* to learn what evidence supported the trial court's ruling.

¶ 110 A sample from the State's brief, trying to prove the dire consequences facing Minor if he were not treated with anti-seizure medication:

"The importance of the medications was emphasized to [Mother] multiple times, and because [Minor] had not received the medications for roughly one month prior to his hospital admission, [Minor] was considered a high risk patient during his admission in February and March 2024. Additionally, [Mother]'s inability to properly and accurately

- 27 -

stock and administer the minor's needed medications put him at severe risk. While it is undisputed that [Mother] made efforts and acted out of care and concern for her son, it also cannot be disputed that her errors and choices put [Minor] at severe risk of harm."

¶ 111   To support these factual statements, the State cites three pages of the medical records. Two of those pages were part of the medical records from Minor's February 2024 admission to Comer that ultimately spawned the mandatory report of neglect. These two pages, like all the others, include countless pieces of information that we could not possibly understand. Here is one section: "#Direct Hyperbilirubinemia - CMV PCR, EBV PCR, hepatitis panel: negative - Will repeat Labs in AM: CBC/Diff, Retic, cmp, Dbili."

¶ 112   Another, longer section:

"#Myoclonic atonic epilepsy

- s/p Keppra load

- mother refusing AED so held Perampanel 4 mg qhs and zonisamide 140 mg every 12 hours

- Perampanel and Zonisamide level sent, results pending

- SW consulted for concerns for medication noncompliance

- IV ativan 0.1mg/kg PRN for seizure > 5 min."

¶ 113   Other sections in those two pages are written in plainer English but still contain medical terminology we cannot fully appreciate, if understand at all:

"[Minor] is a 12 yr old male with HGB SS and myoclonic atonic epilepsy who presents with 4 days of fatigue, jaundice, and sclera icterus in the setting of direct hyperbilirubinemia on lab workup. Bil and LFT trending down. He currently requires admission for monitoring with serial labs.

***

[Minor] is a 12 year old male with hemoglobin SS presenting with fatigue, jaundice with direct hyperbili. His bili is improving today without intervention. Viral etiology work up reassuring. Plan to continue trending labs as outlined. At this time, mom is refusing to allow administration of AEDs and will not pick up attempts to reach her by phone. Awaiting her arrival to the bedside this PM to discuss the importance of compliance with these medications, discuss her concerns and reiterate that he cannot go home without appropriate seizure prophylaxis.

This patient is HIGH RISK based on hemoglobin SS, hyperbilirubinemia, tonic clonic."

¶ 114    The State's proof, then, that the Minor faces dire health consequences if not medicated with anti-seizure drugs is that last line—that he is "HIGH RISK based on hemoglobin SS, hyperbilirubinemia, tonic clonic." Are we supposed to know what these medical terms mean?

¶ 115    Presumably, a qualified doctor could read most, if not all of these notes and understand them perfectly, word-for-word. But we are not qualified doctors. Judges cannot be expected to reliably translate the information contained in these medical records into concrete medical conclusions. See *id*. ¶ 141 (rejecting claim that medical records alone proved mother's neglect, as "there was no testimony from an expert witness to help us make sense of them"); *Molitor v. BNSF Ry. Co.*, 2022 IL App (1st) 211486, ¶ 71 (rejecting defense argument disputing causal link between defendant's products and cancer: "[A]s judges without medical training, we have difficulty with how to credit such an assertion" given that "[t]he defendant has not countered these assertions with any affidavit from an expert witness of its own"); *Abbinanti v. Presence Central & Suburban Hospitals Network*, 2021 IL App (2d) 210763, ¶ 13 ("[J]udges are not doctors and cannot practice medicine from the bench." (Internal quotation marks omitted.)).

¶ 116    Recognizing as much, the GAL tries to help, explaining in its appellate brief that "AED" means "anti-epilepsy drug," which the GAL pulled from a website of the National Institute of Health (NIH). The GAL does the same regarding another medical record that showed that Minor experienced a "GTC." Citing the same NIH website, the GAL explains that "GTC stands for generalized tonic-clonic seizures (formerly called grand mal) and consist of bilateral symmetric convulsive movements (stiffening followed by jerking) of all limbs with impairment of consciousness."

¶ 117    The GAL's helpful translations, unfortunately, only prove our point that these medical records, without the assistance of expert testimony, are indecipherable to judges or any other non-medical professional. There was no explanation from an expert of any of these terms at trial, much less a general translation of what medical conclusions one could draw from them.

¶ 118    That is but one example throughout the State's and GAL's briefs, but it will suffice to show our frustration. How can we possibly review the "evidence" put forth by the State and determine whether the court's neglect finding was or was not manifestly erroneous when we can't even understand or fully appreciate the evidence?

¶ 119    Yet another serious problem with the State's ambush-by-medical-record is that, while the medical records themselves may be exempted from the hearsay rule, some information contained in the medical records may be hearsay itself—hearsay within hearsay, the second level of which might be inadmissible. See *In re A.S.*, 2020 IL App (1st) 200560, ¶ 26 (even if document is admissible under hearsay exception, hearsay contained within document must also be subject to exception to be admissible); *In re Matthew J.*, 2026 IL App (4th) 250436-U, ¶ 53 (same).

¶ 120    But how is the defense supposed to lodge hearsay objections when over 4,600 pages are dumped in at once, without an expert (or anyone else at trial) identifying which pages are salient

to the case? And if no reference is made to any specific pages at trial, as here, how is the defense lawyer supposed to know which pages the State will cite in closing argument or on appeal, when it's too late to object?

¶ 121   For all these reasons, as we did in *H.C.*, and which unfortunately bears repeating once more, we condemn the State's exclusive reliance on medical records to prove medical neglect without the assistance of expert medical testimony. There may be a hypothetical case in which *medical* neglect may be proven without medical expert testimony—but if so, this is certainly not that case.

¶ 122                              C. Evidence Supporting Mother's Position

¶ 123   As noted, Mother did not appear at the adjudicatory hearing. The defense called no other witnesses to support its position. Counsel did not admit any evidence in support of its position. Counsel asked no questions of the State's and GAL's witnesses that would reveal a defense theory; she did not ask any questions, period. Nor did the defense's one-sentence closing argument give us any glimpse of a theory; counsel simply reminded the Court that the State had the burden of proof and requested a ruling in Mother's favor.

¶ 124   On appeal, Mother does the same thing as the State and GAL—she tries to build an argument not based on trial testimony but on the medical records. Mother argues that the State "initiate[d] a prosecution of neglect against [Mother] for daring to seek a second opinion for [her] son after years of following Comer staff's recommendations to put him on medication after medication after medication after medication after medication after medication, none of which helped manage his seizures and all of which she reported had significant complications." That argument is not without at least some support in the medical records.

¶ 125    In August 2021: Minor, "[p]er mom, continues to have seizures and concerned about cognitive slowing side effect of VPA." (We saw the words "valproic acid" in various places in the medical records and are guessing—because no expert translated—that "VPA" is its shorthand.) These concerns prompted a swap from VPA to a drug called Zonisamide, which we will assume is a drug that treats epilepsy, as no expert told us one way or the other.

¶ 126    As of January 2022, Mother had been giving Minor Zonisamide but not the "goal dose of Zonisamide (only on 25 mg BID)." In February 2022, Mother reported "concern[ ] for side effects (aggressive behavior and diarrhea)."

¶ 127    In May 2023, Mother was "concerned that [Minor] is only 'sharp' about 30% of the time and thinks that it has overall been declining [*sic*] *** the medication." In August 2023, Mother reported "that she believes the Zonisamide 'mess with him mental' but would not elaborate; stated that she was unhappy with medication and wanted to discuss alternatives at next appointment. Mom reports needing another refill of medication; will run out soon."

¶ 128    In October 2023, Minor was admitted to the ER "for multiple seizures in the setting of multiple missed doses of Zonisamide in the past few weeks." The notes indicate that Mother had "been giving him 5mg/kg/d instead of prescribed 7 mg/kg/d." In November 2023, Mother followed up on the ER visit and "has been concerned about Zonisamide. She feels that after starting it, he has been sleepwalking and hallucinating. He seems to make up stories and cannot focus well." The neurologist "explained that sleepwalking / hallucinating was unlikely to be due to Zonisamide. Parents adamant about stopping Zonisamide and hesitant to start Perampanel but neurology told them to continue Zonisamide until can get new med."

¶ 129    In May 2024, while Mother retained custody of Minor under the court's order of protection pending the adjudicatory hearing, "[M]om had brought up concerns regarding side

effects of sleep walking, speech delay, and weight loss. The possibility of switching to Briviact was discussed but mom wanted to research side effects prior to making a decision."

¶ 130    And as mentioned, in October 2024, two months before the adjudicatory hearing, Minor was admitted to the emergency department for an arm fracture. Medical records indicated that "patient presented tonight with left arm pain after fall from sleepwalking. Mom is concerned that he potentially had an unwitnessed seizure because he appears tired and expresses concern that his seizure frequency has also increased (one seizure per month for the past two months). Also concerned that Fycompa is causing [Minor] to sleep walk."

¶ 131    The doctor's note added: "In terms of concern for side effect of sleep walking of Fycompa, this is not known to be a common side effect of Fycompa but if family would like to switch medications, options can further be discussed outpatient."

¶ 132    By no means are we suggesting that Mother is right and the State is wrong in this dispute. Indeed, in reviewing the medical records, the doctors at times appeared skeptical of Mother's claim that Minor suffered from "drug-resistant" epilepsy (a diagnosis that, from what we can tell, Mother made on her own). The doctors likewise appeared to question whether the side effects Mother cited actually occurred, self-reported as they were. From our review, the State would appear to have a colorable claim of neglect here, and thus we are reluctant to reverse the court's finding of neglect outright. But this is all the more reason why this case needed a full airing of views and expert medical testimony.

¶ 133    This is clearly not a situation where a mother is flatly refusing medication, full stop—at least as best we can tell through the limited vantage point of medical records. We cannot allow the brief, bare-bones hearing that occurred here to serve as the final word on the subject. The State's prosecution of this serious charge consisted of little more than throwing medical records

into evidence. The defense was almost non-existent, with no questions of any witness, a one-sentence closing argument void of any substance, and no attempt to tell Mother's side of the story, if in no other way than through the medical records.

¶ 134    And the circuit court ruled before even a cursory review of the medical records was possible and without any detailed expert testimony explaining the medication at issue, its necessity to Minor's health, the merits of any alternative treatments Mother sought, or the dire consequences of Minor not taking the medication.

¶ 135    We recognize that Mother missed the adjudicatory hearing. Recall as well, though, that Minor was not in school that day, quite likely home sick with one of the "pain crises" that attended his sickle cell disease (though that is yet another thing we do not know for certain). In any event, we understand that the court has a crowded docket to move, and Mother is responsible for attending the hearing, no matter how many jobs she may work, and even if she is tending to a sick child at home. But even if we put aside the defense or lack thereof, the State bore the burden of proof, and the State's proof, in the form of medical records, leaves us unable to satisfactorily complete our review for manifest error.

¶ 136    The dissent accuses us of "*sua sponte*" considering evidentiary objections not raised at trial and thus forfeited. We are doing no such thing. We are simply commenting on the abject insufficiency of the proof, per Mother's challenge on appeal—one she cannot forfeit. *In re Gail F.*, 365 Ill. App. 3d 439, 445 (2006) (respondent cannot forfeit sufficiency argument on appeal of judgment at bench trial); *Interest of M.R.*, 2022 IL App (1st) 211541-U, ¶ 14 (same). And in any event, far from being *precluded* from doing so, we consider it our responsibility to uphold the integrity of the judicial process, a duty we should not avoid in the name of issue preservation.

¶ 137   We vacate the findings of neglect at the adjudicatory hearing and remand for a new, hopefully more substantive hearing. Mother should be advised that she should make good use of her second chance to attend the adjudicatory hearing, as there likely will not be a third.

¶ 138                              II. Admissibility of CAPS Report

¶ 139   Mother argues on appeal that the court should not have admitted into evidence State's Exhibit 1, the CAPS Report prepared by Dr. Ramaiah and her team, sometimes referred to as the "extract." (We will stick with "Exhibit 1" or the "CAPS report.") Because defense counsel did not object to its admission at trial and thus forfeited the issue, Mother alternatively argues that defense counsel provided ineffective assistance in failing to object. See *Strickland v. Washington*, 466 U.S. 668 (1984); *In re Br. M.*, 2021 IL 125969, ¶ 43 (applying *Strickland* to ineffectiveness claim in parental-termination proceeding); *H.C.*, 2023 IL App (1st) 220881, ¶ 86 (applying *Strickland* to ineffectiveness claim in abuse-and-neglect proceeding).

¶ 140   As we are remanding for a new adjudicatory hearing, we are concerned with neither forfeiture nor *Strickland*. We address this issue because it is likely to recur on remand.

¶ 141   Mother concedes that medical records are generally admissible as records made in the ordinary course of business under section 2-18(4)(a) of the JCA. See 705 ILCS 405/2-18(4)(a) (West 2022). But she argues that the CAPS report does not qualify as such a record, as it was not prepared in the ordinary course of business but was, instead, prepared in anticipation of litigation. The State and GAL claim the report was properly admitted under section 2-18(4)(a).

¶ 142                              A. Section 2-18(4)(b)

¶ 143   Because we are concerned with getting the right answer on remand and not with principles of forfeiture—even appellate forfeiture—we will start with what is likely the correct answer, though neither party has addressed it: The CAPS report is likely admissible under

subsection (4)(b), not (4)(a), of section 2-18 of the JCA. Section 2-18(4)(b) provides that "[a]ny indicated report filed pursuant to the Abused and Neglected Child Reporting Act shall be admissible in evidence." *Id.* § 2-18(4)(b). An "indicated report" under the Abused and Neglected Child Reporting Act, in turn, is defined as "a report made under this Act if an investigation determines that credible evidence of the alleged abuse or neglect exists." 325 ILCS 5/3 (West 2022); see *In re J.C.*, 2012 IL App (4th) 110861, ¶ 22.

¶ 144   By all appearances, the CAPS report, State's Exhibit 1, is the report that Comer Hospital transmitted to DCFS per its obligations under the reporting statute. Indeed, the last line of the report states that "IL DCFS report made for 79-Medical Neglect, intake ID 14827680. DCFS will follow up outpatient after discharge." And we know, of course, that DCFS "determine[d] that credible evidence of the alleged *** neglect exists." 325 ILCS 5/3 (West 2022). If, in fact, the CAPS report admitted as State's Exhibit 1 is the report that was transmitted to DCFS, then it is an "indicated report" admissible under section 2-18(4)(b) of the JCA.

¶ 145   Dr. Ramaiah never said as much in her brief direct testimony, so this fact has not been established. If the State can establish as much on remand, the report is admissible on that basis.

¶ 146                                    B. Section 2-18(4)(a)

¶ 147   We agree with Mother that Exhibit 1 does not qualify for admissibility under section 2-18(4)(a) of the JCA, for reasons both technical and substantive.

¶ 148   Subsection (4)(a) of section 2-18 is generally considered a "business records" exception to the hearsay rule, tailored specifically to abuse-and-neglect cases under the JCA. We discussed it briefly earlier. Relevant here is a slightly longer portion:

    "Any writing, record, photograph or x-ray of any hospital or public or private agency,

    whether in the form of an entry in a book or otherwise, made as a memorandum or record

- 36 -

of any condition, act, transaction, occurrence or event relating to a minor in an abuse, neglect or dependency proceeding, shall be admissible in evidence as proof of that condition, act, transaction, occurrence or event, if the court finds that the document was made in the regular course of the business of the hospital or agency at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter. A certification by the head or responsible employee or agent of the hospital or agency having knowledge of the creation and maintenance of or of the matters stated in the writing, record, photograph or x-ray attesting that the document is the full and complete record of the condition, act, transaction, occurrence or event and that it satisfies the conditions of this paragraph shall be prima facie evidence of the facts contained in such certification." 705 ILCS 405/2-18(4)(a) (West 2024).

¶ 149   The technical reason the CAPS report does not qualify for admissibility under subsection (4)(a) is that the document lacked the necessary "certification by the head or responsible employee or agent of the hospital" (*id.*) that the document complies with the substantive requirements of subsection (4)(a).

¶ 150   By contrast, the full boat of over 4,600 medical records, admitted as State's Exhibit 1a, contains such a certification. Specifically citing section 2-18(4)(a) of the JCA, Comer's custodian of records certified that Minor's medical records were "made in the regular course of business and that it was in the regular course of business of the hospitals to make such records."

¶ 151   Absent that certification, the CAPS report—State's Exhibit 1—cannot be admitted under subsection (4)(a), much like the rules of evidence do not permit the "business records" exception to hearsay to apply absent a certification from a custodian of records. See Ill. R. Evid. 803(6) (eff. Jan. 25, 2023) (business-records exception); Ill. R. Evid. 902(11) (eff. Sept. 28, 2018)

(certification of records of regularly conducted activity); *H.C.*, 2023 IL App (1st) 220881, ¶ 105 (noting similarity in certification requirements under section 2-18(4)(a) and rules of evidence).

¶ 152    On substantive grounds, we likewise agree with Mother that the CAPS report was not admissible under section 2-18(4)(a). Documents that fit within this exception to the hearsay rule are those "made as a *memorandum or record* of any condition, act, transaction, occurrence or event" and which are "made in the regular course of the business of the hospital or agency *** *at the time of the act*, *transaction, occurrence or event, or within a reasonable time thereafter*." 705 ILCS 405/2-18(4)(a) (West 2022) (emphases added). These documents are excepted from the hearsay rule because they are routine in nature, merely memorializing events that recently happened; they carry indicia of reliability because the records would be useless to the business if they were inaccurate. See *H.C.*, 2023 IL App (1st) 220881, ¶ 152; *Solis v. BASF Corp.*, 2012 IL App (1st) 110875, ¶ 86; *Troyan*, 367 Ill. App. 3d at 734.

¶ 153    The investigative report prepared by the CAPS team does not fit neatly within this category. Unlike an employee who inputs data on a regular basis or a doctor who memorializes her observations close in time to a patient visit, the CAPS team interviewed treating physicians, reviewed medical records going back ten years, and then compiled a report that included some medical records and a timeline of Minor's medical appointments over those ten years, with summaries of each, before reaching a legal conclusion that Minor's condition met the definition of "neglect" under the state mandatory-reporting law. That goes well beyond merely *memorializing* or *recording* an act at or near the time of its occurrence, the kind of rote, routine daily undertaking that section 2-18(4)(a) envisions. See 705 ILCS 405/2-18(4)(a) (West 2022).

¶ 154    Perhaps that is why the legislature carved out a special exception in subsection (4)(b) for the admissibility of "indicated report[s]" that DCFS deems credible. *Id.* § 2-18(4)(b). Indeed, the

fact that the legislature went to the trouble of singling out these indicated reports as an exception separate and distinct from the more general "business records" exception in subsection (4)(a) suggests that the legislature did *not* consider hospital abuse-and-neglect investigative reports to be business records, else subsection (4)(b) would be hopelessly redundant. See *DeLuna v. Burciaga*, 223 Ill. 2d 49, 60 (2006) (court must view statutory language in light of other relevant provisions); *Mosby v. Ingalls Memorial Hospital*, 2023 IL 129081, ¶¶ 36, 39 (court should avoid interpretation that renders word or passage superfluous or redundant).

¶ 155   Mother cites two decisions where we held that hospital reports finding abuse or neglect were inadmissible under section 2-18(4)(a). In *H.C.*, 2023 IL App (1st) 220881, ¶ 115, DCFS asked Loyola Hospital for a " 'Child Advocacy and Protection' evaluation" that would appear to be strikingly similar to the CAPS report here. Dr. Jones, specializing in child advocacy and protection (like Dr. Ramaiah here), issued a report that supported a finding of neglect. *Id.*

¶ 156   In finding this report better characterized as prepared in anticipation of litigation, rather than a memorialization prepared in the ordinary course of business, this court noted that the reason for the report was to perform an evaluation for medical neglect (*id.*), the hospital discussed it with DCFS and suggested an allegation of medical neglect (*id.*), the report "offered a specific legal opinion that Nol. B. was neglected, rather than a medical diagnosis" (*id.* ¶ 116), and the hospital did not provide or recommend any treatment for the child (*id.*).

¶ 157   Likewise, in *In re A.P.*, 2012 IL App (3d) 110191, ¶ 16, *aff'd*, 2012 IL 113875, DCFS suspected abuse and referred the minor to a children's clinic for evaluation. The clinic issued a report to DCFS confirming a determination of abuse. *Id.* The appellate court again held that the report was prepared to assist DCFS in litigation and not in the ordinary course of business. *Id.*

¶ 158    Here, DCFS did not ask Comer Hospital to prepare this report. Rather, a Comer

physician, suspecting neglect, referred the matter to the CAPS team for a determination of

neglect. But we don't see that as a meaningful distinction. In each case, the work of the

physicians' team was the same: review the relevant information, determine whether the minor is

"abused" or "neglected" under state law, and prepare a report substantiating that finding. The

CAPS team was obviously aware that its report of neglect here would at least be considered by

DCFS for a prosecution of neglect in court; that is the very point of a mandatory report.

¶ 159    For all these reasons, the CAPS report, State's Exhibit 1, was not admissible under

section 2-18(4)(a) of the JCA. As noted earlier, it might well be admissible under subsection

(4)(b) of section 2-18, but the State would need to lay the appropriate foundation on remand to

establish that this report was, indeed, the "indicated report" sent to DCFS.

¶ 160                III. Dispositional Order and Violation of Order of Protection

¶ 161    Because we vacate the adjudicatory order finding neglect, we necessarily vacate the

dispositional order based on those findings, too. For that reason, we have not recounted the

dispositional hearing thus far. But in the middle of the dispositional hearing, the State made an

oral "motion to violate" the order of protection previously entered against Mother as a condition

for maintaining custody of Minor pending the adjudicatory hearing. That motion was granted, as

we will see, and Mother raises the granting of that motion as a point of error on appeal. So it will

be necessary to briefly recount the temporary-custody and dispositional hearings along with the

proceedings on the oral "motion to violate" before analyzing Mother's specific point of error.

¶ 162                         A. Temporary Custody Hearing

¶ 163    Recall that, near the time it filed its petition for adjudication of wardship in March 2024,

the State filed a motion for temporary custody. See 705 ILCS 405/2-10 (West 2022). In

temporary custody hearings, the court first determines whether there is probable cause that a minor is abused, neglected, or dependent, as the case may be. *In re Ashley F.*, 265 Ill. App. 3d 419, 424 (1994). If so, the court determines whether it is a matter of urgent and immediate necessity for the protection of the minor to remove the child from parental custody. *Id.*

¶ 164   The court here found probable cause of neglect but declined to remove Minor from Mother's custody. The court entered an order of protection that required Mother, among many other things, to (1) medicate Minor consistently with anti-seizure medication; (2) attend all of Minor's medical appointments; (3) report any injuries to Minor to DCFS, and (4) ensure that Minor attend school daily. See 705 ILCS 405/2-25(1) (West 2022).

¶ 165   If it believes that the subject of the order of protection (here, Mother) has violated its terms, the State may charge a violation of the protective order and seek temporary custody of the child. Critical for our purposes is the precise governing language:

> "If a petition is filed charging a violation of a condition contained in the protective order and if the court determines that this violation is of a critical service necessary to the safety and welfare of the minor, the court may proceed to findings and an order for temporary custody." *Id.* § 2-25(9).

¶ 166   From the entry of the protective order in March 2024 to the adjudicatory hearing on December 2, 2024, no violation of the protective order was alleged. Indeed, as chronicled above, the social worker, Skylar Ward, testified at status hearings in both April and June 2024 that she had no concerns about Mother's compliance with the protective order.

¶ 167                    B. Dispositional Hearing (December 2)

¶ 168   Fast forward to December 2, after the adjudicatory hearing concluded with the court's findings of neglect. The court was ready to proceed immediately with the dispositional hearing.

The GAL asked for a continuance, given Mother's absence and given evidence that had just come to its attention—Minor's October 2024 arm fracture, which Mother did not report to DCFS. The court decided to begin the dispositional hearing but continue it so that Mother would be in attendance for at least part two.

¶ 169   The State called Skylar Ward, the case worker who has been assigned to Minor's family since the case opened in March and who had been providing updates to the court as detailed above. The GAL also cross-examined Ms. Ward.

¶ 170   Ms. Ward had been visiting Mother's home twice a month by this point. When last she had visited the home in November, she had no concerns for Minor's well-being or safety. She spoke privately with Minor, who confirmed that he knew what his prescribed anti-seizure medication was and was, in fact, taking it. He also confirmed that "he eats breakfast, lunch, and dinner, and that his mom cooks for him and ensures that he is eating his vegetables." Ms. Ward independently confirmed that Minor was up to date on his medication, including refills.

¶ 171   Mother told Ms. Ward that Minor was doing well. Mother had found a new doctor for Minor, whom Ms. Ward believed worked at Comer Hospital. Ms. Ward spoke to staff at Comer, who told her that Mother had missed neurology appointments in September and October. Ms. Ward had checked that morning (December 2), and Mother had not rescheduled the appointment.

¶ 172   Ms. Ward did not have personal knowledge of the circumstances surrounding Minor's broken arm on October 16; Ms. Ward was "out for most of October" for what appears to be a medical reason. But the intake report at the hospital indicated that Minor "was sleepwalking and fell, tripped over an object on the floor, and caught himself with his arm." Ms. Ward discussed this incident with Minor, who told her the same thing: "that he was sleepwalking, and he woke up on the floor, and his arm was hurting."

¶ 173   Mother told Ms. Ward "she was working her night job at the time, and [Minor] was being watched by his older sister, who *** was babysitting, and she called her saying that he had fallen and really hurt his arm." Ms. Ward verified that Mother did not report this injury to DCFS, as required by the protective order. Ms. Ward also learned that Comer had tested Minor to ensure that he was still taking his anti-seizure medication, but those results had yet to come back.

¶ 174   Ms. Ward spoke to Minor's school and was told that Minor "has been attending," but he was absent from school "today," meaning December 2. Ms. Ward also testified that her scheduled visits with Mother were generally "successful" but she unable to conduct unannounced visits because when she would call Mother to be let into the apartment building, either Mother would not answer the phone, or Mother would state that she was not home.

¶ 175   Ms. Ward confirmed that Mother "was asked to complete a parenting class, as well as individual counseling, and providing the daily needs for her minors." (It appears that Mother has three children in the house; Minor is the middle child.) When asked whether Mother had completed services, Ms. Ward said that Mother has been taking individual therapy but "[s]he has not started engaging with her parenting class. She says that this is due to her work schedule, as well as working with A Knock at Midnight to do her parenting class with her counselor for individual therapy." Ms. Ward has never met Father, though she understands that Minor speaks with him by phone and sometimes sees him in person with Mother present.

¶ 176   The defense had no questions of this witness.

¶ 177        C. Motion to Vacate/Violate Protective Order (December 2)

¶ 178   Immediately after Ms. Ward's testimony, the State orally moved to "vacate the order of protection today and bring the kid into care." The State cited the following points:

"[Mother]'s not here today. The minor is not in school today. I'm very concerned about the neurology appointments being skipped and not rescheduled. I'm very concerned that [Father] is having contact with this minor. I'm not sure what kind of contact, how often that contact is. \*\*\*

We're not sure what his attendance records at school are. We're not sure who lives in the home. The case worker has not been able to make an unannounced visit because when she arrives there, the mother either doesn't answer or says she's not home. All of those are concerns for this minor child who now has a fractured arm, supposedly from sleepwalking, but he could also have a fractured arm, your Honor, because he's having a seizure, and we don't have the lab reports back to show the levels of medication in the blood to ensure that this minor is taking his medication as prescribed."

¶ 179   The GAL was hesitant to bring Minor under State care but did feel that, "at a minimum, the Court has the authority and should violate the order of protection today."

¶ 180   The court then said to defense counsel: "I don't know what the order of protection says with regard to contact with [Father], but I know it says he's supposed to go to school and take his medication, so we're definitely in the violative portion."

¶ 181   Defense counsel objected, stating that Mother was "not waiving notice of motion for any of these requests. This is the first time hearing of this. I'm not even quite sure what we're hearing, and neither is anybody else. There are question marks, but those answers could go multiple ways."

¶ 182   The court shared the defense's concern with lack of notice. The court also left open the possibility that Mother "might have some wonderful explanation that I should hear." The court continued the dispositional order and the oral motion to violate to December 5.

¶ 183                                    D. December 5 Hearing

¶ 184    At the continued hearing on December 5, Mother was present. First, the State sought to enter new exhibits into evidence. Some apparently concerned allegations of domestic violence against Father from 2023, though the court did not admit those documents. The State was allowed to enter exhibits of recent medical records from Comer Hospital and La Rabida Hospital, as well as Minor's school attendance records. The defense had no objection.

¶ 185    The GAL went first on the oral motion to vacate the protective order. The GAL did not present evidence *per se* but related a conversation she had with her client, Minor. The GAL told the court that Minor wanted to remain at home with Mother, and "it's my understanding from speaking with [Minor] that the father is residing in the home." Based on what she gleaned from her attorney-client communication, and despite acknowledging that "there is no specific provision within the order of protection prohibiting the father from being in the home," the GAL requested "that [Father] either needs to make himself available to be assessed for services within the next seven days, or that order of protection needs to be vacated and violated."

¶ 186    The GAL added more reasons: "missed appointments," for one. For another, Father's domestic-violence allegations, the only proof of which the court had just denied admission. "[T]hough they were not admitted," said the GAL, "they are relevant in terms of if this is somebody who is residing in the home, the need for services. And domestic violence is a needed service for [Mother]. So I do think it presents a safety risk to [Minor]."

¶ 187    But "most importantly," said the GAL, "we don't have any information that he is current with his medical needs of the seizure disorder." The GAL stated, from her conversation with her client, that Minor has "very concerning speech delays," which concerned the GAL because "that could be a side effect of the seizures due to the not taking the medication. *** And I would hate

to think that that is—we might never know because of the limits of medical treatment and medical testing, but that is a side effect of seizures, and untreated seizures at that."

¶ 188    The State added that, according to the medical records, the doctors at Comer were skeptical that the October arm fracture was caused by sleepwalking, that it may have been caused by a seizure. Counsel noted that doctors were skeptical that sleepwalking is a side effect of the medication Minor was taking. The State concluded: "I would renew my oral motion to violate and vacate the order of protection based on my arguments on Monday and the additional exhibits today and the additional concerns that have now been brought to the Court's attention."

¶ 189    Before the defense was given any opporunity to respond, the Court said to Mother:

"I appreciate—and please trust and understand, any decision I make it is not because I think you do not love your child. That is not even on my radar. I had a physician, whose job it is to care for children, come into my courtroom on Monday. She took time out of caring for patients, which is what she does every day, to come and give me the information about the seriousness of your son's condition and your failure to try to work with the physician to find a good balance on the medication, because everything has side effects. Aspirin has side effects.

So I am going to let [defense counsel] make her record, but I am vacating and violating that order of protection. So Ms. [Skylar] Ward, you need to put your coat on so you can go get that baby. We need find him a place to be. So [defense counsel], make your record."

¶ 190    Defense counsel did so: "The Court's ruling would be over my strenuous objection. Thank you."

¶ 191    The court entered an order granting the State's motion to vacate the protective order.

¶ 192                                E. Arguments on Appeal

¶ 193    Before this court, Mother challenges the circuit court's order granting the State's oral

motion to violate the order of protection. We have no hesitation in vacating the circuit court's

order vacating the protective order based on Mother's violation.

¶ 194    The first of several flaws in the procedure is that the State never reduced its oral motion

to writing. Section 2-25(9) of the JCA, as noted earlier, contemplates but one mode of

procedure—that "a petition is filed charging a violation of a condition contained in the protective

order." 705 ILCS 405/2-25(9) (West 2022). An oral motion can't be "filed." And a "petition" is

universally understood as "[a] formal *written* request presented to a court or other official body."

Black's Law Dictionary (12th ed. 2024) (emphasis added).

¶ 195    This is no technicality, either. Section 2-25(9) concerns the situation where the parent has

been allowed to retain custody of the child pending the adjudicatory hearing, but only subject to

the terms of a protective order. But the State has now asked for a finding that the parent has

violated the protective order, thus requiring the removal of the minor from parental custody. The

very least the State can do is put its reasons in writing, to put the parent on notice that a

separation of parent and child may be imminent and why, so the parent may respond.

¶ 196    One of the many reasons that a written motion is fairer is that it forces precision on the

drafter to state, in clear language, with the opportunity for editing and polishing, the reasons that

the parent violated the protective order. The extemporaneous spoken word is rarely even close in

terms of clarity or focus. Here, for example: what were the State's reasons that Mother violated

the court order? It depended on when you asked. Here is a breakdown of the State's reasons

articulated at the December 2 hearing:

　　　　1.　"Mother's not here today." Mother should have attended the adjudicatory hearing, but

her absence did not violate the protective order.

2. "The minor is not in school today. *** We're not sure what his attendance records at school are." Surely the fact that a child has missed a single day of school between the months of March and December cannot be the basis for violating the protective order. (Mother would later testify at the dispositional hearing—after the court had already vacated the protective order—that Minor suffered frequent "pain crises" from his sickle cell disease that caused school absences.) Beyond that, the State openly conceded that it had no idea how many school days Minor had missed. At previous status hearings, the social worker had testified to no concerns with school attendance.

3. "I'm very concerned about the neurology appointments being skipped and not rescheduled." An important concern and, to be sure, a potential violation of the protective order. Had Mother been able to testify, the court would have heard her say, as she later did at the dispositional hearing (after the court had already vacated the protective order and it was too late), that Minor no longer sees a doctor at Comer Hospital, that he is now seeing a doctor at La Rabida Hospital; they only use Comer Hospital for testing.

4. "I'm very concerned that [Father] is having contact with this minor. I'm not sure what kind of contact. *** We're not sure who lives in the home." All parties later agreed that the protective order said nothing about Father's residency or contact with Minor.

5. "The case worker has not been able to make an unannounced visit because when she arrives there, the mother either doesn't answer or says she's not home." A valid concern and, if true, potentially a violation of the protective order.

6. "All of these are concerns for this minor child who now has a fractured arm,

supposedly from sleepwalking, but he could also have a fractured arm *** because he's having a seizure, and we don't have the lab reports back to show the levels of medication in the blood to ensure that this minor is taking his medication as prescribed." The protective order required Mother to keep Minor up to date on medications. The State conceded here that it had no proof, only suspicion, that Minor was not being properly medicated.

¶ 197    At the continued hearing on December 5, the GAL and the State gave the following reasons to find Mother in violation of the protective order:

1.  "It's [the GAL's] understanding *** that the father is residing in the home." The GAL presented no sworn testimony or proof, merely a proffer from the GAL herself from her attorney-client conversation. Again, the protective order never mentioned a word about where Father lived or his contact with Minor.

2.  Evidence of Father's alleged domestic violence in 2023, which the State tried to introduce only moments earlier for the first time, "though not admitted" into evidence by the court, is "relevant in terms of if this is somebody who is residing in the home, the need for services." Thus, "[Father] either needs to make himself available to be assessed for services within the next seven days, or that order of protection needs to be vacated and violated."

3.  "And domestic violence is a needed service for [Mother]." Another new claim, the first time the government had mentioned it, and irrelevant to the protective order.

4.  "Missed appointments."

5.  "Most importantly, we don't have any information that he is current with his medical needs of the seizure disorder." The GAL was particularly concerned based on her

personal observation that Minor has "very concerning speech delays," which "could be a side effect of the seizures due to the not taking the medication."

¶ 198 Needless to say, the government's arguments presented a bit of a moving target from day to day, highlighting the need for a written petition.

¶ 199 Notably, in announcing its ruling that Mother was in violation of the protective order, without allowing Mother or defense counsel to present any evidence or even respond, the court cited *none* of the government's reasons, relying instead on the evidence at the adjudicatory hearing—which concerned Mother's actions up to and including February 2024, *before the protective order even existed*, and with some embellishment at that:

"I had a physician, whose job it is to care for children, come into my courtroom on Monday *** and give me the information about the seriousness of your son's condition and your failure to try to work with the physician to find a good balance on the medication, because everything has side effects. *** So I am going to let [defense counsel] make her record, but I am vacating and violating that order of protection."

¶ 200 Aside from the State's failure to reduce its oral motion to writing—a prejudicial, reversible error on its own—the fact that the court gave the defense no opportunity to speak, even while Mother was waving on the screen for the opportunity, violates basic principles of due process and fundamental fairness. Whatever might be said of Mother missing the adjudicatory hearing, she was present for *this* hearing.

¶ 201 Petitions to vacate a protective order, to immediately sever a parent-child bond, should not be something the State or the court wings off-the-cuff. If reduced to writing, the parties and the court are clear on the specific allegations, and the respondent is fully on notice of the charges he or she must answer. And the respondent, of course, must be given the chance to answer.

¶ 202    There is more, but we have said enough. We vacate the court's order vacating the order of protection based on Mother's violations. The State, of course, is always free to file a proper written petition to vacate the protective order. And it should go without saying that Mother is entitled to notice and the opportunity to respond.

¶ 203                              CONCLUSION

¶ 204    We are as concerned for the welfare of this child as anyone. That is precisely why we are so frustrated by the adjudicatory and related hearings under review. These hearings cannot be rushed. They cannot be taken so cavalierly that a document dump is essentially all the State puts forth in terms of proof. If expert testimony is necessary, as it clearly was here in this medical-neglect case, then expert testimony must be provided. Both parent and child deserve nothing less. The constitution demands nothing less before the government separates families.

¶ 205    As we have said more than once, the State had a colorable case of neglect. By no means do we suggest otherwise, nor do we comment one way or the other on the conclusion from the first hearing. That would be missing the point of this opinion, which is that the government must do much more, and the court must demand much more, than what occurred below.

¶ 206    The judgment of the circuit court, finding Minor neglected at the adjudicatory hearing, is vacated. The judgment of the circuit court, finding Mother in violation of the protective order and vacating that protective order, is vacated. The court's April 22, 2024 protective order is reinstated. The judgment of the circuit court at the dispositional hearing is vacated. The cause is remanded for a new adjudicatory hearing.

¶ 207    Vacated and remanded.

¶ 208    VAN TINE, P.J., dissenting.

¶ 209    In my view, the circuit court's finding of neglect was not against the manifest weight of the evidence. Therefore, I respectfully dissent.

¶ 210    The State alleged that Mother neglected Minor under sections 2-3(1)(a) and (b) of the Act (705 ILCS 405/2-3(1)(a), (b) (West 2024)) because she did not provide Minor with adequate care and exposed him to an injurious environment. A neglected minor is one "who is not receiving *** medical or other remedial care recognized under State law as necessary for a minor's well-being, or other care necessary for the minor's well-being." *Id.* § 2-3(1)(a). Similarly, case law holds that a child who does not receive appropriate medical evaluations or care is neglected due to lack of care and an injurious environment. *In re Adam B.*, 2016 IL App (1st) 152037, ¶¶ 38-40; *In re Erin A.*, 2012 IL App (1st) 120050, ¶ 7; *In re Stephen K.*, 373 Ill. App. 3d 7, 20 (2007). Beyond these broad principles, there is no specific formula a court must follow in finding neglect due to inadequate medical care. Neglect does not have a "fixed and measured meaning and takes its content from the specific circumstances of each case." (Internal quotation marks omitted.) *In re Christina M.*, 333 Ill. App. 3d 1030, 1034 (2002). Neglect has "a fluid meaning" and encompasses both willful and unintentional disregard of parental duty. *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004).

¶ 211    To find neglect in this case, the circuit court had to find by a preponderance of the evidence that Minor required medical care for his well-being but did not receive that medical care while in Mother's custody. See 705 ILCS 405/2-3(1)(a) (West 2024); *Erin A.*, 2012 IL App (1st) 120050, ¶ 7. On review, we consider only whether the circuit court's finding of neglect was against the manifest weight of the evidence. See *Arthur H.*, 212 Ill. 2d at 464. A finding is against the manifest weight of the evidence when the "opposite conclusion is clearly evident." *Id.*

¶ 212                               I. Adjudicatory Hearing Evidence

¶ 213   At the adjudicatory hearing, the circuit court received three types of evidence of neglect: expert witness testimony, fact witness testimony, and documentary evidence.

¶ 214                               A. Expert Witness Testimony

¶ 215   Dr. Veenah Ramaiah is a child abuse pediatrician who is board certified in general pediatrics and sub-board certified in child abuse pediatrics. She practices at the University of Chicago Medical Center as a pediatric emergency physician and has been a member of the Child Advocacy and Protective Services (CAPS) team since 2010. CAPS is a multidisciplinary team within Comer Children's Hospital. When hospital staff have concerns of child abuse or neglect, they consult the CAPS team. Dr. Ramaiah is also a member of the American Academy of Pediatrics Committee on Child Abuse and Neglect, as well as the Illinois chapter of the Helper Society, an academic society focusing on child maltreatment. At the adjudicatory hearing, the court qualified Dr. Ramaiah as an expert without objection.

In her role as a CAPS team member, Dr. Ramaiah participated in a consultation regarding Minor in late February and early March 2024. The consultation "involved an extensive chart review" and discussions with Minor's treaters. Dr. Ramiah reviewed Minor's medical records using the EPIC medical documentation system. Through this process, Dr. Ramaiah learned that

> "[Minor] was admitted to the hospital related to sickle cell disease, and it was discovered that he has a seizure disorder, and it was found out by the treating team, the hematology team, and the neurologist that he was no longer on medications, and that the parents had discontinued the medications without speaking to a medical provider."

The CAPS team "create[d] a timeline of treatment including appointments for [Minor]." After consultation with the CAPS team, Dr. Ramaiah diagnosed Minor with medical neglect, which is

both a medical diagnosis and a child welfare diagnosis. Dr. Ramaiah rendered her diagnosis of medical neglect "to a reasonable degree of medical certainty using accepted and peer reviewed methods within the field of child abuse and neglect pediatrics."

¶ 216    The State's only question on cross-examination was whether Dr. Ramaiah spoke with Mother. Dr. Ramaiah answered that she did not. Mother did not cross-examine Dr. Ramaiah.

¶ 217                                  B. Fact Witnesses

¶ 218    Chyna Roundtree and Brittany Land Steele both testified that Minor did not receive medication while in Mother's custody. Roundtree testified that on March 5, 2024, Mother stated that Minor "was not taking medications at the time due to concerns with the medications that were prescribed" and "she would not put him back on the medication." Rather, she contacted "holistic professionals" regarding "alternative ways to address his issues" such as "dietary changes." Steele testified that on March 19, 2024, Mother reported that Minor "had been discharged from the hospital, and she was giving him fruits and vegetables and she was not giving him the medication, that he had been fine."

¶ 219    Mother did not cross-examine Roundtree or Steele.

¶ 220                                  C. Medical Records

¶ 221    The trial court admitted without objection Minor's medical records from Comer Children's Hospital. The majority characterizes the State's introduction of medical records as a "document dump" of some 4,600 pages (*supra* ¶ 204), but that is not entirely accurate. It is true that the State introduced the full hospital records spanning 4,608 pages as exhibit 1A. But the State also introduced a 19-page excerpt, designated exhibit 1, which summarizes Minor's treatment at Comer Children's Hospital in late February and early March 2024. It also includes the CAPS team report and timeline.

¶ 222   The State introduced the medical records pursuant to section 2-18(4)(a), which provides that hospital records "made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a minor in an abuse, neglect or dependency proceeding" are "admissible in evidence as proof of that condition, act, transaction, occurrence or event, if the court finds that the document was made in the regular course of the business of the hospital." 705 ILCS 405/2-18(4)(a) (West 2024). The medical records included a business records certification from the University of Chicago Hospitals' records custodian. See *id.*

The 19-page excerpted summary of Minor's treatment at Comer Children's Hospital conveys the following facts. I omit abbreviations and medical terms whose meaning would not be apparent to a judge without specialized medical training.

- Minor's "Medical Diagnoses" included "Sickle Cell Disease," "Epilepsy," and "Medical Neglect."

- On February 27, 2024, Minor was admitted to the hospital for "jaundice. Mom did not report seizure history or medication use on admission. Told primary team he has not been taking any medications for his seizures. Witnessed seizure during admission. *** Mom refused both medication[s]." "When team attempted to restart medically necessary [medication], parents refused treatment."

- After admission to the hospital, Minor was "not responding to questions to name or place. Did have a loss of urine continence."

- "Mom was reportedly unaware that patient had had a seizure this morning after she left, and Mom was declining both seizure medications *** prescribed." "Day team attempted

to contact Mom twice today by phone, but were unable to reach her or leave voicemail due to her voicemail being full."

- When hospital staff managed to contact Mother, she "repeatedly stated that she does not want [Minor] on these medications, as she feels that they make him 'sleepy, sleepwalk, change him mentally, and damage his liver.' Throughout our conversation, she reiterated that she does not like what these medications do to him and that she feels he will have seizures regardless." A treatment team member "explained that these medications are to control and prevent him from having seizures, and that seizures can result in permanent brain damage if they are not controlled. Mom conferred on the phone with [Minor's] Dad, requested time to think but in the end was adamant about declining both seizure medications."

- On March 1, 2024, a social worker told Mother that "the medical team is stating that he needs to be on some type of medication." "Mom said she doesn't care who we call she is not giving her son that medication."

- Based on a "chart review of [Minor]'s medical care, there is significant history of failure to present to clinic for follow up appointments, nonadherence to prescribed medications as proven by multiple low medication levels. *** There have also been previous DCFS reports filed for medical neglect."

- The late February 2024 hospitalization was "the first instance of the family fully discontinuing a prescribed seizure medication on their own. Mom and Dad both refused medication when initially approached by the medical team during this admission. However after multiple discussions with the primary and subspeciality medical provider,

family did accept a slower [medication regimen]; nonetheless, there is a concern from the overall team that they only agreed to this plan in order to be discharged and do not plan on filling the prescription."

¶ 223 The excerpted medical records also include the timeline of Minor's treatment that the CAPS team created, which spans June 6, 2014, to February 27, 2024. In addition, the excerpted medical records include the CAPS team report, which Dr. Ramaiah signed. It reflects that the CAPS team "reviewed the medical records, including the patient's imaging and laboratory studies, discussed this case with the treating medical team and discussed this case with DCFS." Although Dr. Ramaiah did not examine Minor personally, a resident did. The "[t]otal time spent was 120 minutes. Greater than 50% was spent in direct care and care coordination."

¶ 224 Mother presented no evidence at the adjudicatory hearing.

¶ 225                         II. Manifest Weight of the Evidence

¶ 226 The ultimate question is whether the trial court's finding of neglect was against the manifest weight of the evidence. See *Arthur H.*, 212 Ill. 2d at 464. In my view, it was not.

¶ 227 The witness testimony and medical records paint a straightforward and unrebutted picture of neglect due to inadequate medical care. There is no dispute that Minor experiences seizures. Mother apparently does dispute whether Minor requires medication to control those seizures but presented no evidence on that point. So, the fact that Minor requires seizure medication of some kind stands uncontroverted. Additionally, there is no dispute that Mother refuses to give Minor seizure medication despite medical professionals repeatedly advising her that such medication is necessary. Putting those uncontroverted facts together, it is more likely than unlikely that Minor "is not receiving *** medical or other remedial care recognized under State law as necessary for

a minor's well-being, or other care necessary for the minor's well-being." See 705 ILCS 405/2-3(1)(a) (West 2024). Therefore, Minor is neglected. See *id.*

¶ 228   Based on this record, I certainly cannot find that the "opposite conclusion is clearly evident" such that the circuit court's finding of neglect is against the manifest weight of the evidence. See *Arthur H.*, 212 Ill. 2d at 464. Reaching the "opposite conclusion" in this case would require finding that (1) Minor does not suffer seizures, (2) Minor suffers seizures but does not require medication for them, or (3) Mother provided such medication instead of refusing it. Nothing in the record of the adjudicatory hearing supports any of those conclusions. And Mother did not present any evidence at the adjudicatory hearing, so there is no evidence weighing against the circuit court's neglect finding. All the evidence is on one side of the scale, so to speak.

¶ 229   My impression is that the majority agrees that, most likely, Minor is not receiving necessary medical care in Mother's custody. The majority acknowledges that "the State would appear to have a colorable case of neglect here" and is "reluctant to reverse the court's finding of neglect outright." *Supra* ¶ 132. The majority's issue is with *how* the evidence supporting the finding of neglect came in. To some degree I understand the majority's concerns. The witness testimony at the adjudicatory hearing was bare bones (even though it did clear the preponderance standard). The State introducing thousands of pages of medical records, while permitted under section 2-18(4)(a), was not an effective way of presenting evidence. A more effective approach is for the State to offer a summary of voluminous records pursuant to Illinois Rule of Evidence 1006 (eff. Jan. 1, 2011). But these are just observations about how the presentation of evidence could have been better, not whether it was sufficient. In my view, it was.

¶ 230    The majority *sua sponte* raises evidentiary objections such as foundation, expert qualifications, and hearsay, which no one made at the adjudicatory hearing. To preserve evidentiary issues that arise during an adjudicatory hearing, the parties must object and obtain a ruling at that hearing. *In re Zariyah A.*, 2017 IL App (1st) 170971, ¶ 110; *In re W.D.*, 194 Ill. App. 3d 686, 701 (1990). The parties in this case did not do that. Even though the parties forfeited these evidentiary issues (see *Snelson v. Kamm*, 204 Ill. 2d 1, 24-25 (2003)), the majority is raising and ruling on them anyway. This court's duty is to evaluate the manifest weight of the evidence as it appears in the record before us. See *Stephen K.*, 373 Ill. App. 3d at 20 (manifest weight analysis is based on our "review of the record."). Our duty is not to identify technical evidentiary objections that the parties chose not to make part of the record, contrary to what the majority believes. *Supra* ¶ 136. "[A] reviewing court should not normally search the record for unargued and unbriefed reasons to reverse a trial court judgment." *Saldana v. Wirtz Cartage Co.*, 74 Ill. 2d 379, 386 (1978). Yet that is what the majority is doing with respect to almost all the evidentiary concerns it raises, as the parties never raised them at the adjudicatory hearing.

¶ 231    For example, the majority finds that Dr. Ramaiah's diagnosis of medical neglect was a legal conclusion, not a legitimate medical diagnosis. *Supra* ¶ 69. First, that is not quite accurate. Doctors specializing in pediatrics and child abuse and neglect *do* render diagnoses of medical neglect, which come into evidence in child abuse and neglect cases. See, *e.g.*, *In re N.K.*, 2021 IL App (1st) 200534, ¶¶ 21, 44-47. As Dr. Ramaiah explained, medical neglect is both "a medical diagnosis" and "a child welfare diagnosis." In this case, Dr. Ramaiah rendered that diagnosis after reviewing Minor's medical records and consulting with his direct treaters as well as the CAPS team. But more importantly, the majority is *sua sponte* raising an issue that nobody raised during the adjudicatory hearing. None of the parties objected to Dr. Ramaiah's diagnosis of

medical neglect as an improper legal conclusion. On the contrary, everyone accepted that diagnosis.

¶ 232   Similarly, the majority argues that Dr. Ramaiah, who is not a neurologist, was not qualified to testify to what medications are necessary to treat epilepsy or the complications that result from untreated epilepsy. *Supra* ¶¶ 71-73. But Dr. Ramaiah did not testify on those topics, so her qualifications (which the parties did not challenge anyway) are not at issue. Somewhat confusingly, the majority also complains that Dr. Ramaiah did not opine on neurological and seizure-related issues (*supra* ¶ 78) even though the majority believes she was not qualified to do so.

¶ 233   The majority argues that, to find neglect, the circuit court needed to hear the testimony of a neurologist (preferably one of Minor's treaters) who could explain (1) what specific seizure medication Minor needed and why, (2) what complications would arise if Minor did not receive such medication, (3) what the medical terminology in the hospital records meant, and (4) the foundation for the opinions within those records. I disagree. It is not accurate to say, as the majority does, that "the State was required to prove (1) that a particular medication was necessary to effectively treat Minor's epilepsy and (2) that Minor would suffer adverse health consequences, such as brain damages or death, if he did not receive the medication." *Supra* ¶ 104. The majority cites no authority for those elements.

¶ 234   Rather, the evidence had to establish only that Minor was "not receiving *** medical or other remedial care recognized under State law as necessary for a minor's well-being, or other care necessary for a minor's well-being." See 705 ILCS 405/2-3(1)(a) (West 2024). Dr. Ramaiah, an undisputedly qualified medical doctor who reviewed Minor's case as part of the CAPS team, was competent to testify that Minor required seizure medication *of some sort*, did

not receive it due to Mother's refusal, and was, therefore, medically neglected. As the majority's annotation of the closing arguments concedes, the evidence established that " '[Minor] was diagnosed with sickle cell. He had a seizure disorder. The mother refused to give him the medication he needed.' " *Supra* ¶ 48. That was sufficient to support the circuit court's finding of neglect under section 2-3(1)(a).

¶ 235    The majority expresses great frustration with the State's admission of Minor's medical records, referring to it as a document "dump" and an "ambush-by-medical record." *Supra* ¶¶ 3, 4, 64, 91, 103, 119, 120, 204. But as explained above, section 2-18(4)(a) expressly authorized the State to introduce the medical records. See 705 ILCS 405/2-18(4)(a) (West 2024). We should not vacate the circuit court's ruling based on the State introducing evidence the Act specifically allows, particularly where no one objected. To the extent the majority argues that the medical records are simply too long, section 2-18(4)(a) imposes no page limit on medical records admitted as evidence. *Id.*

¶ 236    Furthermore, the facts within the medical records were properly before the circuit court pursuant to section 2-18(4)(a) even without a doctor to explain them page-by-page. As the majority acknowledges (*supra* ¶ 95), medical records admitted pursuant to section 2-18(4)(a) can prove "whether a diagnosis was made, or whether medical care took place on a certain day, or even if a particular recommendation was made as to treatment." *In re H.C.*, 2023 IL App (1st) 220881, ¶ 152. The key facts in the medical records fit those categories. The medical records reflect Minor's diagnoses (epilepsy, sickle cell disease, and medical neglect), recommendations as to treatment (seizure medication), and Mother's response to those recommendations ("adamant" refusal to allow seizure medication).

¶ 237   I also disagree with the majority's view that the medical records are so technical as to be useless as evidence. *Some* of the medical records are beyond the understanding of a judge with no specialized medical training. But other records—much of the 19-page excerpt, for example— are within the understanding of a reasonably educated layperson. A judge can understand the *significance* of concepts like epilepsy, seizures, and anti-seizure medication even if he or she does not have the depth of understanding that a medical professional would. Put differently, it does not take a medical expert to understand that a child who suffers seizures needs some form of seizure medication, and it is neglectful for a parent to flatly refuse such medication as Mother did.

¶ 238   The majority expresses concern about how the circuit court's finding of neglect might impact a future termination hearing. *Supra* ¶ 63. No termination hearing has occurred and, as best I can tell, none is scheduled. Speculation about what might happen at a termination hearing is not a proper basis for holding that the circuit court's ruling at the adjudicatory hearing is against the manifest weight of the evidence.

¶ 239   I acknowledge that the adjudicatory hearing in this case might look unusually perfunctory to many lawyers and judges. It was not a presentation that would carry the burden of proof in a medical malpractice case or a criminal trial. But child abuse and neglect proceedings happen quickly for a reason. Potentially neglected children often cannot wait for the parties to arrange, prepare, and present expert testimony from multiple doctors. Continuing a trial for several months might be unremarkable in a medical malpractice case, but it could be the difference between life and death for a child with serious medical needs. Even for healthy children, delays of a few months represent significant disruption in their lives. Resources are limited for the

attorneys, parties, and witnesses in these cases. Sometimes, the parties must do what they can with what they have to protect the child in a timely fashion. I believe that is what happened here.

¶ 240    The majority is mistaking a somewhat unimpressive presentation by the *parties* for an erroneous finding of neglect by the *court*. Could the parties have put on a better case? Probably. But does that mean the opposite conclusion—that Minor is not neglected, does not suffer seizures, or does not need seizure medication—is clearly evident? No. Therefore, I would hold that the circuit court's finding of neglect is not against the manifest weight of the evidence, and I would affirm that ruling.

¶ 241    Accordingly, I respectfully dissent.

***In re T.J.*, 2026 IL App (1st) 242406**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 24-JA-243; the Hon. Lisa M. Taylor, Judge, presiding. |
| **Attorneys for Appellant:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Madeline R. Townsend and Benjamin Ginzky, Assistant Public Defenders, of counsel), for appellant. |
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Gina DiVito, and Marina Para, Assistant State's Attorneys, of counsel), for the People.<br><br>Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain, of counsel), for other appellee. |